**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN**

DUSTIN WEBER,

               Plaintiff,

    v.

GREAT LAKES EDUCATIONAL LOAN
SERVICES, INC.,

               Defendant.

Case No. 13-cv-291

Removed from:
Dane County Circuit Court
Case No. 13-CV-0143

**DEFENDANT'S BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Great Lakes Educational Loan Services, Inc., by and through its counsel, Michael Best & Friedrich LLP, hereby submits this Brief in support of its Motion for Summary Judgment.

**I.**    <u>**INTRODUCTION.**</u>

Dustin Weber has a student loan that is serviced by Great Lakes Educational Loan Services, Inc. ("Great Lakes"). Mr. Weber claims that Great Lakes violated the Wisconsin Consumer Act ("WCA") and the Fair Debt Collections Practices Act ("FDCPA") by calling Joy Pagel three times, over a five-month period, in an effort to obtain his contact information. Great Lakes contacted Ms. Pagel because Mr. Weber listed her as a reference, whom could be contacted about his student loans, on the Master Promissory Note ("MPN") he signed to obtain his student loan.

Great Lakes moved to dismiss Mr. Weber's WCA claims, and this Court dismissed all Weber's WCA claims but one.  Great Lakes now moves to dismiss Mr. Weber's remaining WCA claim and FDCPA claims pursuant to Federal Rule of Civil Procedure 56 because "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). [1]

Great Lakes is entitled to judgment as a matter of law on Mr. Weber's FDCPA claim (Count Four of Mr. Weber's First Amended Complaint) because Mr. Weber cannot establish that Great Lakes is a "debt collector" under the FDCPA. Moreover, even if Great Lakes were a debt collector, Mr. Weber does not point to any communication that Great Lakes made "in connection with the collection of any debt," as required to prevail under the FDCPA.

Great Lakes is also entitled to summary judgment on Mr. Weber's sole remaining WCA claim because Mr. Weber has not and cannot establish that Great Lakes "communicate[d] with the customer or a person related to the customer with such frequency or at such unusual hours or in such a manner as can reasonably be expected to threaten or harass *the customer*" as required.  *See* Wis. Stat. § 427.104(1)(g).    Mr. Weber was not involved in any of the three calls on which he bases his claims.    Mr.

---

[1] On August 16, 2013, Plaintiff moved for leave to amend his complaint, for a second time, to include additional claims.  Great Lakes opposed Plaintiff's motion noting, among other things, that Plaintiff was aware of the additional claims prior to filing his complaint; that Plaintiff failed to identify any good cause for why he should be granted leave after the Court's amendment deadline had  passed; and finally, that any amendment would be futile. (See Dkt. No. 16.) Accordingly, in an effort to conserve resources, Great Lakes has conducted discovery and submits this motion for summary judgment based upon the current operative Amended Complaint, dkt. no 1.  Should this Court decide to grant Plaintiff leave to amend for a second time, which it should not, Great Lakes reserves the right to conduct discovery on those additional claims and submit further dispositive motions.

Weber instead points to three calls that Great Lakes made to *Ms. Pagel*, whom Mr. Weber himself listed on his MPN as a reference who could be contacted about his student loans.  Weber does not point to any way in which *he* was abused or harassed by the phone calls, and Ms. Pagel did not point in her deposition to anything that could support such a showing.

Finally, Mr. Weber is also unable to establish, as a matter of law, that he is entitled to punitive damages.  The conduct alleged by Mr. Weber does not rise to the high level of intentional or malicious conduct required to warrant punitive damages.  This Court should consequently strike Mr. Weber's request for punitive damages from his complaint and rule that Mr. Weber may not present punitive damages to a jury.

## II.   <u>FACTS</u>

The following facts are a brief summary of Great Lakes' Proposed Findings of Facts ("PFOF") submitted with this brief.

### A.   Great Lakes' Federal Loan Servicing Obligations.

Great Lakes services student loans for the Department of Education's ("DOE") Direct Loan Program.  (PFOF ¶ 6.)  DOE makes direct student loans.  (PFOF ¶ 7.)  Borrowers sign a MPN when they get Direct Student Loans.  (PFOF ¶ 8.)  On the MPN, borrowers are required to provide the names, phone number, and addresses of two references.  (PFOF ¶ 9.)  Borrowers give the DOE (and, by extension, DOE's agents, such as Great Lakes) authority to contact references about student loans.  (PFOF ¶ 10.)

Mr. Weber listed two references:  his mother, Joy Pagel, and his father, Shawn Weber. [2] (PFOF ¶ 11.)

As a loan servicer, Great Lakes is required to make "due diligence" efforts to contact borrowers who fail to pay their loans or to make any effort to set up alternative payment arrangements.  (PFOF ¶ 13.)  Great Lakes' due diligence obligations are set forth in contract with DOE and in the Higher Education Act ("HEA") statute and regulations.  (PFOF ¶ 14.)

Great Lakes has requirements about the number of times it must contact the borrower or attempt to get borrower contact information from references.  (PFOF ¶ 15.) Great Lakes also has authority to help borrowers who have not paid on loans set up alternative payment arrangements or even postpone payment for a period of time to help borrowers avoid default.  (PFOF ¶ 16.)  DOE—and, by extension, Great Lakes—has a strong interest in helping borrowers avoid default because default comes with numerous consequences for borrowers, including the negative credit history effects and the inability to get additional federal student loans.  (PFOF ¶ 17.)

The MPN's terms state that the in signing, the borrower acknowledges that "the principle purposes for collecting the information on this form . . . [are] to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and report on your loan(s) if your loan(s) become delinquent or in default."   (PFOF ¶ 18.)  Therefore, borrowers acknowledge that the information collected on the MPN, which would

---

[2] The MPN requires that at least one reference be a parent or legal guardian.  (PFOF ¶ 12.)

include the references listed in Section 7, may be used to locate the borrower.  (PFOF ¶ 19.)

**B.     Mr. Weber's Loan And Servicing History.**

**Mr. Weber received a DL Stafford and Non-Subsidized Stafford loan on December 28, 2010, to attend University of Wisconsin - Milwaukee.  (PFOF ¶ 20.)  The next day, on December 29, 2010, Great Lakes began servicing the loan.  (PFOF ¶ 21.) Mr. Weber attended one semester at UW-Milwaukee.  (PFOF ¶ 22.)  In October 2011, Great Lakes received notice that Mr. Weber withdrew from school after attending one semester.   (PFOF ¶ 23.)   Consistent with its contractual and regulatory obligations to DOE, Great Lakes updated Mr. Weber's status, converted the loans to repayment, and sent Mr. Weber a payment schedule and coupon book.  (PFOF ¶ 24.)**

Mr. Weber never made a payment on his student loan.  (PFOF ¶ 25.)  From December 2011 through March 2012, Great Lakes repeatedly tried to reach Mr. Weber by phone and by letter.  (PFOF ¶ 26.)  Great Lakes never got a hold of Mr. Weber, and Mr. Weber never responded to Great Lakes' letters or messages.  (PFOF ¶ 27.)

In April 2012, Great Lakes placed Mr. Weber's account in a "skip status" for borrowers whose contact information needs to be corrected.  (PFOF ¶ 28.)  As part of its efforts to locate Mr. Weber while his account was in skip status, Great Lakes sent an email to Mr. Weber every 40 days requesting he provide his current contact information.  (PFOF ¶ 29.)  Again, Mr. Weber did not respond to any of Great Lakes' letters.  (PFOF ¶ 30.)  On April 16, 2012 Great Lakes sent a request to Experian/Metro requesting updated contact information, but Metro was unable to provide any new

contact information for Mr. Weber.  (PFOF ¶ 31.)  On May 16, 2012, Great Lakes called Mr. Weber's father, Shawn Weber, one of the references Mr. Weber listed on the MPN for his loans.  (PFOF ¶ 32.)  Mr. Shawn Weber's phone was identified as temporarily disconnected, and Great Lakes never spoke to him.  (PFOF ¶ 33.)

On May 16, 2012, Great Lakes also called and spoke to Mr. Weber's other reference, Ms. Pagel.  (PFOF ¶ 34.)  Ms. Pagel provided a new address for Mr. Weber but refused to provide Mr. Weber's phone number or to give Mr. Weber a message to call Great Lakes.  (PFOF ¶ 35.)  Great Lakes mailed a letter to Mr. Weber at the address Ms. Pagel provided, but the letter was returned with a forwarding address that matched the address Great Lakes previously had on system.  (PFOF ¶ 36.)  On August 20, 2012, Great Lakes again called Ms. Pagel to request updated contact information. (PFOF ¶ 37.)  Ms. Pagel again refused to provide Mr. Weber's phone number.  (PFOF ¶ 38.)

Two days later, on August 22, 2012, Great Lakes received a letter from Attorney Briane Pagel indicating that he represented Mr. Weber.  (PFOF ¶ 39.)  That same day, Great Lakes called and left a message for Attorney Pagel.  (PFOF ¶ 40.)  On August 24, 2012, Great Lakes spoke to Attorney Pagel and Great Lakes advised they could not provide Attorney Pagel with any information without a Federal Privacy Act Waiver (FPA) signed by Mr. Weber.  (PFOF ¶ 41.)  A FPA form was mailed to Mr. Weber and to Attorney Pagel.  (PFOF ¶ 42.)  On September 10, 2012, Great Lakes received the signed FPA from Mr. Weber.  (PFOF ¶ 43.)

In October 2012, approximately one month before Mr. Weber would default on his loan, Great Lakes called Ms. Pagel in an effort to get Mr. Weber's phone number or to get a message to Mr. Weber.  (PFOF ¶ 44.)  Ms. Pagel again refused to provide Great Lakes Mr. Weber's phone number or to give Mr. Weber a message from Great Lakes. (PFOF ¶ 45.)

Mr. Weber made no payments on his loan and defaulted on November 13, 2012, long after Great Lakes began initially servicing Mr. Weber's loan.  (PFOF ¶ 46.)

### C.      Ms. Joy Pagel's Testimony Regarding The Alleged Calls.

Great Lakes deposed Ms. Pagel on January 2, 2014.  Ms. Pagel testified that Great Lakes called her on three separate occasions, spanning a six-month period from approximately May 2012 through October 2012.  (PFOF ¶ 47.)  Mr. Weber does not and did not live with Ms. Pagel.  (PFOF ¶ 48.)  But Ms. Pagel acknowledged that her phone number and name were listed on Mr. Weber's loan application as a reference.  (PFOF ¶ 49.)  Ms. Pagel agreed that her complaints regarding the calls related to the "tone" used by the Great Lakes representatives and to her discomfort being called about her son's student loans and not the content of the calls or the actual words Great Lakes representatives used.  (PFOF ¶ 50.)

### 1.      The May 2012 Call.

Ms. Pagel could not remember the exact date of Great Lakes' first call to her but estimated that it occurred in May 2012.  (PFOF ¶ 51.)  She stated that she was called during regular business hours at the phone number Mr. Weber listed for her in the MPN for his loan.  (PFOF ¶ 52.)  Ms. Pagel recalled that she was contacted by a male

representative and was asked to provide Mr. Weber's contact information, including his address and phone number.  (PFOF ¶ 53.)  She provided Great Lakes with Mr. Weber's address, and although she knew Mr. Weber's phone number, she did not provide it. (PFOF ¶ 54.)  Ms. Pagel testified that the caller then said, "Now I would like his phone number."  (PFOF ¶ 55.)  When Ms. Pagel wouldn't give the number, the caller said, "Why won't you give me [sic] his phone number?  I need to contact him."  (PFOF ¶ 56.) Mr. Weber has not provided an affidavit from Ms. Pagel.  (PFOF ¶ 57.)  But Ms. Pagel testified at the deposition that she had signed an affidavit, which was an exhibit at the deposition, in which she said the caller raised his voice to "not quite a shouting level." (PFOF ¶ 58.)  Ms. Pagel testified that the caller said, "Why won't you give him our [sic] phone number.  He owes us money.  We need to contact him."  (PFOF ¶ 59.)  Ms. Pagel also stated in the affidavit that she believed the caller from Great Lakes was "hostile"; "snide"; and "sarcastic."  (PFOF ¶ 60.)  Ms. Pagel testified that the call lasted five to ten minutes.  (PFOF ¶ 61.)

## 2. <u>The August 2012 Call.</u>

Ms. Pagel testified that she was called again in late summer or early fall.  (PFOF ¶ 62.)  As with the first call, Ms. Pagel could not remember the exact date but estimated that the call occurred in August 2012, again during regular business hours.  (PFOF ¶ 63.)  Ms. Pagel testified that the second call was by a female representative.  (PFOF ¶ 64.)  She said that the caller informed her that Great Lakes was calling to obtain Mr. Weber's phone number.  (PFOF ¶ 65.)  Ms. Pagel testified that the caller identified herself and then said: "I want his phone number.  We don't have his phone number.

I'm calling to get his phone number." (PFOF ¶ 66.) Although Ms. Pagel had Mr. Weber's telephone number, she again decided to not give it to Great Lakes. (PFOF ¶ 67.) Ms. Pagel testified that when she suggested that Great Lakes write to Mr. Weber, the caller said, "If I give you our number, would you have him call us?" (PFOF ¶ 68.) When Ms. Pagel said she wouldn't feel comfortable doing that, the caller allegedly ended the call. (PFOF ¶ 69.) According to Ms. Pagel, the entire call lasted approximately 3-5 minutes. (PFOF ¶ 70.)

### 3.   The October 2012 Call.

Ms. Pagel testified that Great Lakes called her a third time in approximately October 2012, again by a female caller.[3] (PFOF ¶ 71.) The caller introduced herself and said that she was trying to obtain Mr. Weber's phone number. (PFOF ¶ 73.) Ms. Pagel informed the caller that she had previously given Great Lakes Mr. Weber's address but did not want to provide his phone number. (PFOF ¶ 74.) Ms. Pagel testified that the caller then said "If I give you our number, will you have him call?" (PFOF ¶ 75.) Ms. Pagel responded that she would not, and the caller ended the call. (PFOF ¶ 76.) Ms. Pagel testified that this call lasted approximately one to two minutes. (PFOF ¶ 77.)

### D.   Great Lakes' Call Log.

Great Lakes' call logs show a call to Ms. Pagel on May 15, 2012 at 12:00 p.m., which lasted approximately two minutes and four seconds.[4] (PFOF ¶ 80.) Great Lakes' call logs show a call to Ms. Pagel was made on August 20, 2012 at 10:28 a.m., which

---

[3] This is inconsistent with Ms. Pagel's affidavit which indicates that the October 2012 caller was male. (PFOF ¶ 72.)

[4] This is inconsistent with Ms. Pagel's testimony that the call was approximately 5-10 minutes long. (*See* PFOF ¶ 61.)

lasted approximately one minute and 44 seconds. [5]  (PFOF ¶ 78.)  Great Lakes' call logs show a call to Ms. Pagel was made on October 2, 2012 at approximately 5:19 p.m., which lasted approximately one minute and 24 seconds.  (PFOF ¶ 79.)  Great Lakes' call logs show that all three calls were made to the number Mr. Weber provided for Ms. Pagel on his MPN.  (PFOF ¶¶ 78, 79, 80.)

## III.   SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof . . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A party opposing summary judgment must do more than raise "metaphysical doubt[s]" about material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), because courts "are not required to draw every conceivable inference from the record, and mere speculation or conjecture will not defeat a summary judgment motion." *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (quotations omitted).

## IV.   ARGUMENT

### A.   Summary Judgment Is Appropriate As To Count Four Because Mr. Weber Has Not And Cannot Make A Claim Under The FDCPA.

To prevail on his FDCPA claim, Mr. Weber must establish that: (1) he has been the object of collection activity arising from a consumer debt; (2) that Great Lakes is

---

[5] This is inconsistent with Ms. Pagel's testimony that the call was approximately three to five minutes long. (*See* PFOF ¶ 70.)

"debt collector" as defined by the FDCPA; and (3) that Great Lakes has engaged in a prohibited act or has failed to perform a requirement imposed by the FDCPA.  See *15 U.S.C. § 1692; see also McKinney v. Cadleway Props., Inc.,* 548 F.3d 496, 500 (7th Cir. 2008). Great Lakes is entitled to judgment as a matter of law because Mr. Weber's Amended Complaint does not meet these required elements and because Mr. Weber has not and cannot establish any facts to support his claims.

### 1.  Great Lakes Is Not A "Debt Collector" Under The FDCPA.

The FDCPA prohibits certain conduct of a debt collector.  The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a.  The definition specifically excludes "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt *which was not in default at the time it was obtained by such person*."  15 U.S.C. § 1692(a)(6)(f)(iii) (emphasis added).  Great Lakes began servicing Mr. Weber's loan in December 2010, while Mr. Weber was still in school, before his payment obligation even began.  (PFOF ¶ 21 ) This was well in advance of Mr. Weber's delinquency and November 2012 default.  Therefore, as a matter of law, Great Lakes is not a "debt collector" under the FDCPA.

The Seventh Circuit has consistently held that loan servicers are not "debt collectors" under the FDCPA when they began servicing a loan prior to default.  *See,*

*e.g., Carter v. AMC. LLC*, 645 F.3d 840, 843 (7th Cir. 2011) (finding the FDCPA did not apply because "[t]he Act excludes not only the original creditor but also any person who tries to collect a debt that "'was not in default at the time it was obtained by such person.'") (quoting 15 U.S.C. § 1692a(6)(F)); *Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 387 (7th Cir. 1998) ("The plain language of § 1692a(6)(F) tells us that an individual is not a "debt collector" subject to the Act if the debt he seeks to collect was not in default at the time he purchased (or otherwise obtained) it."); *Johnson v. Sallie Mae Servicing Corp.*, 102 Fed. Appx. 484, 487 (7th Cir. 2004) ("Likewise, Johnson cannot establish that Sallie Mae is a "debt collector" subject to liability under the FDCPA. The FDCPA exempts attempts to collect debts that were not in default when obtained."); *McKinney v. Cadleway Props., Inc.*, 548 F.3d at 501 (noting that under the FDCPA, "one who acquires a "debt not in default" is categorically not a debt collector").

### 2.  Even if Great Lakes were  a "debt collector" under the FDCPA, none of the conduct alleged was "in connection with the collection of any debt," as required to prevail under the FDCPA.

Mr. Weber's alleges that Great Lakes violated the FDCPA by contacting Weber and/or Ms. Pagel after Attorney Pagel informed Great Lakes he represented Mr. Weber. For the communications Mr. Weber complains of to fall under the FDCPA, however, they would have had to be "in connection with the collection of any debt'" (*see* 15 U.S.C. §§ 1692e,  1692g) fall under the ambit of the Act."  *Bailey*, 154 F.3d at 388.   They were not.

Courts sitting in the Seventh Circuit have set forth factors to consider in determining whether a communication was "in connection with the collection of any

debt": (1) the absence of a demand for payment; (2) the nature of the parties' relationship; and (3) the purpose and context of the communications, viewed objectively. *Shelley v. Ocwen Loan Servicing*, LLC, No. 1:13-cv-506, 2013 U.S. Dist. LEXIS 122439, at * 12 (S.D. Ind. Aug. 28, 2013). . Based on these factors, the Seventh Circuit has held that "a letter informing plaintiff of the current status of their account and demanding no payment was *not* a communication "in connection with the collection of any debt" under the FDCPA. *McCready v. Jacobsen*, No. 06-2443, 2007 U.S. App. LEXIS 9651, at *4 (7th Cir. Apr. 25, 2007); *see also Bailey*, 154 F.3d at 389 (an informative letter that does not demand payment is not a communication "in connection with the collection of any debt.").

Consideration of these factors clearly establishes that the communications on which Mr. Weber bases his claims were not "in connection with the collection of any debt," and accordingly, are not covered by the FDCPA.

### a.    Great Lakes Did Not Demand Payment.

The first inquiry under this test is the absence of a demand for payment. *Shelley,* 2013 U.S. Dist. LEXIS 122439, at *12.  In each of the three calls made to Ms. Pagel, it is undisputed that Ms. Pagel was being contacted for Mr. Weber's contact information. (*See* PFOF ¶¶ 47-77.)  Ms. Pagel consistently testified that the telephone calls were to obtain contact information.  (*See* PFOF ¶¶ 53, 65, 73.)  Additionally, Mr. Weber acknowledged in his interrogatory responses that "The purpose of these phone calls was for my address." (PFOF ¶ 89.)  There is no allegation of or evidence to support that a demand for payment was made by Great Lakes.

- 13 -

      **b.**      **The Nature Of The Parties Relationship Was That Ms. Pagel Was Listed As Mr. Weber' Reference On His MPN.**

Mr. Weber listed Ms. Pagel as a reference on his MPN.  (PFOF ¶ 11.)  Through the MPN, Mr. Weber consented to Ms. Pagel being contacted in regards to his loan. (PFOF ¶ 10.)  In listing his references, Mr. Weber acknowledged that the information collected on the MPN, which would include the information listed in Section 7, may be used to locate him.  (PFOF ¶ 19.)  Thus, consistent with the MPN, Great Lakes contacted Mr. Weber's references in an effort to obtain his contact information.  These efforts were made prior to Mr. Weber's loan entering default in an effort to prevent Mr. Weber from defaulting on his obligations.  (*See* PFOF ¶ 46.)

      **c.**      **The Purpose Of The Communications Was For Great Lakes To Obtain Contact Information.**

Great Lakes was Mr. Weber's loan servicer.  Great Lakes began servicing Mr. Weber's student loan as soon as he got the loan, while he was enrolled in college and was not yet required to pay his loans.   As a loan servicer, Great Lakes was obligated through its HEA regulatory and contractual obligations to the DOE to engage in "due diligence" to contact Mr. Weber and to help Mr. Weber avoid default.   The HEA regulations require a lender and the loan servicers to exercise due diligence by performing a series of collection efforts when a student borrower becomes delinquent. 34 C.F.R. § 682.411. (PFOF ¶¶ 13-14.)  This regulation specifies that in the event of delinquency, a loan servicer must make certain efforts to contact the borrower, including by written notice and telephone contact, within a certain time period.  *See id.* § 682.411(a).  There are a great number of regulations that apply to parties that service

federal loans for the DOE.  For example, if a borrower misses a payment, at least one written notice or collection letter must be sent to the borrower within 15 days that notifies the borrower of the delinquency.  34 C.F.R. § 682.411(c).  If a debtor still is delinquent after 15 days from this period, the lender or loan servicer must engage in at least four diligent efforts to contact the borrower by telephone and send at least four collection letters urging the borrower to make the required payments on the loan.  34 C.F.R. § 682.411(d).  At least one of the diligent efforts to contact the borrower by telephone must occur on or before, and another one must occur after, the 90th day of delinquency.  *Id.*

Pursuant to the skip-tracing provision at § 682.411(h), "within 10 days of its receipt of information indicating that it does not know the borrower's current address, the lender must begin to *diligently* attempt to locate the borrower through the use of effective commercial skip-tracing techniques."  *Id.* (emphasis added).  The Regulations further explain what diligent efforts must be taken:

> These efforts must include, but are not limited to, sending a letter to or making a diligent effort to contact each endorser, relative, reference, individual, and entity, identified in the borrower's loan file, including the schools the student attended . . . These efforts must be completed by the date of default with no gap of more than 45 days between attempts to contact those individuals or entities.

*Id.*

The purpose of all of Great Lakes' calls was to comply with its federal servicing obligations.  When Mr. Weber failed to make payments and Great Lakes did not have current contact information for Mr. Weber, Great Lakes was federally required to make

its due diligence efforts, including calling Mr. Weber's references. *See* 34 C.F.R §
682.411(h).

These factors all counsel a finding that Great Lakes was not communicating "in
connection with the collection of any debt" as is required under the FDCPA.  Thus, even
if Great Lakes were a debt collector, Mr. Weber's claim fails because the calls Mr. Weber
cites to do not trigger the requirements or protection of the FDCPA.

**B.**     **Summary Judgment Is Appropriate On Mr. Weber's Sole Remaining
State Claim Because Mr. Weber Fails To Establish A Violation Under
Wis. Stat. 427.104(g).**

In dismissing nearly all of Mr. Weber's claims under the WCA, this Court held
"although these calls were infrequent and apparently made at a reasonable hour, the
allegations regarding the 'aggressive' behavior of Great Lakes' representative suffice to
make out a plausible claim for harassment, if just barely." (Dkt. No. 12 at 11.)

To prevail on his one remaining WCA claim, Mr. Weber would have to make the
showing set forth in Section 427.104(g) and establish that "[i]n attempting to collect an
alleged debt" Great Lakes communicated "with the customer or a person related to the
customer with such frequency or at such unusual hours or in such a manner as can
reasonably be expected to threaten or harass *the customer*."  Wis. Stat. § 427.104(g).  It is
well established that the standard under the WCA is an objective one, meaning that it
must be objectively reasonable for the conduct at issue to "threaten or harass the
customer."  Wis. Stat. § 427.104(1)(g); *see also Hornik,* 114 Wis. 2d at 168.

The Court should enter judgment on behalf of Great Lakes because no reasonable juror could find that Great Lakes' three reference calls to Ms. Pagel were objectively threatening or harassing to Mr. Weber.

### 1.      Mr. Weber Fails To Show The Three Reference Calls to Ms. Pagel Violated Wis. Stat. Section 427.104(g).

In his Amended Complaint, Mr. Weber bases his claims entirely on reference calls Great Lakes made to Ms. Pagel. Great Lakes' calls to Ms. Pagel do not, however, establish a WCA violation, particularly one harming Mr. Weber.

Ms. Pagel testified that she was contacted three times over a several month period and each time was asked to provide contact information for Mr. Weber.  (PFOF ¶ 47.)  Ms. Pagel testified that she did not like the "tone" of the calls, but she failed to identify any specific threatening or harassing language or indeed any substantive dialogue beyond the fact that Great Lakes was simply calling in an attempt to obtain Mr. Weber's contact information.   (PFOF ¶ 50.)   At best, Mr. Weber's allegations, accepted as true for purposes of summary judgment, merely establish that Great Lakes contacted Ms. Pagel three times during a five-month period, via telephone, at the number Mr. Weber provided for Ms. Pagel on the MPN for his student loan.  (Dkt. No. 1 at ¶¶ 4, 9, 10 & 12.)  Thus, Great Lakes contacted or attempted to contact Mr. Weber's listed reference—for precisely the reason Mr. Weber authorized Ms. Pagel to be contacted—on a less than monthly basis prior to Mr. Weber's default.  *Id.*  Ms. Pagel testified that she told Mr. Weber about the first call, either in a conversation or voicemail (she could not remember), but she did not call him after the second or third call.  (PFOF ¶ 81.)  But Ms. Pagel did not suggest that Great Lakes did anything that

could possibly be objectively threatening or harassing to Mr. Weber.  (*See* PFOF ¶¶ 47-77.)  Moreover, Mr. Weber's discovery responses failed to identify anything Great Lakes did that could be objectively threatening or harassing to him. (PFOF ¶¶ 82-89.)  Rather, Mr. Weber's discovery responses merely state that he was "worried."  (PFOF ¶ 89.)  But, as a matter of law, this does not rise to "threaten" or "harass" as required by the WCA.  Indeed, it almost goes without saying that someone in Mr. Weber's position would be "worried" by outstanding student loan obligations, irrespective of what was said to a reference.

There are few cases analyzing § 427.104(1)(g), but one Wisconsin case is directly on point and commands judgment for Great Lakes.  In *Associates Financial Services Co. v. Hornik,* 114 Wis. 2d 163, 169, 336 N.W.2d 395 (Ct. App. 1983), the Wisconsin Court of Appeals affirmed the judgment in favor of the creditors finding that four to five monthly calls *to the plaintiff himself,* where there was no threatening or obscene language used, would not be reasonably expected to harass the plaintiff.  *Id.*  The plaintiff alleged that the debt collectors made 69 calls over a 19-month period.  *Id.* at 169.  The appellate court held that "[a] debtor, however, who is liable for monthly payments and who consistently fails to make those payments may reasonably expect a creditor to call each month to make further arrangements for the month's payment."  *Id.*  The court also analyzed that the defendant twice said to the plaintiff, "God damn it, Walt, what are we going to do about this?"  *Id.*  at 170.  The court found that such conduct was not actionable under the WCA.  *Id.*

Mr. Weber's showing is even less—far less—than the plaintiff's in *Associates Financial Services Co.* Weber's Amended Complaint does not point to any calls Great Lakes made to him. (Dkt. No. 1, pp. 4-9.) He points to calls Great Lakes made to his reference to get information he authorized his references to be called to obtain: his contact information (*See id.*) It is undisputed that Great Lakes called Ms. Pagel only three times, several months apart, and at reasonable hours. (PFOF ¶ 47.) It is also undisputed Great Lakes did not threaten Ms. Pagel at any time, nor did Great Lakes use any obscene or even remotely inappropriate language. (*See* PFOF ¶¶ 47-77; 90.) Each time, the callers from Great Lakes simply attempted to obtain Mr. Weber's current contact information and to leave a message for Mr. Weber. (*See* PFOF ¶¶ 53, 65, 73, 91.) Ms. Pagel herself acknowledges that the most concerning part of the calls was the "condescending tone" of the callers and the fact that she was being contacted about her son's student loans. (PFOF ¶ 50.) The record does not contain any evidence remotely suggesting that Great Lakes' three reference calls to Ms. Pagel could have reasonably caused Mr. Weber to feel threatened or harassed, and Mr. Weber does not so much as suggest that he did. Great Lakes submits that this is because it would be impossible to demonstrate that one felt reasonably harassed or threatened by three calls to a reference number to obtain the debtor's contact information—especially when, as here, the reference herself acknowledged not being troubled by the particular language Great Lakes callers used during the calls.

    **2.**     **If The Court Considers Analogous FDCPA Cases, It Is Even More Clear That The Conduct Alleged Is Not Actionable.**

Although the FDCPA does not apply to Mr. Weber's allegations, cases analyzing harassing or abusive conduct under the FDCPA are instructive as to Mr. Weber's WCA claim. Under Section 1692d, the FDCPA enumerates several examples of what may constitute harassment or abuse. *Id.* The FDCPA specifically lists the following examples of prohibited behavior:

> (1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person.
> (2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.
> (3) The publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 603(f) or 604(3) [604(a)(3)] of this Act [15 U.S.C. § 1681a(f) or 1681b(a)(3)].
> (4) The advertisement for sale of any debt to coerce payment of the debt.
> (5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.
> (6) Except as provided in section 804 [15 U.S.C. § 1692b], the placement of telephone calls without meaningful disclosure of the caller's identity.

15 U.S.C. § 1692d. Mr. Weber has failed to produce any evidence to suggest that Great Lakes engaged in any of the enumerated conduct. This lack of evidence further supports the finding that Great Lakes' communications were not reasonably threatening or harassing. *Beach v. LVNV Funding LLC*, No. 12-cv-778, 2013 U.S. Dist. LEXIS 63640, at * 7 (E.D. Wis. May 3, 2013) ("Though the subsections contained in the section are not intended to "[limit] the general application" of the section, they are nonetheless useful in contextualizing the behavior prohibited by the section.")

The Court's holding in *Gnoinska v. Messerli & Kramer, P.A.*, No. 12-947, 2012 U.S. Dist. LEXIS 156614, at *8 (D. Minn. Nov. 1, 2012) is particularly instructive.  In *Gnoinska*, the plaintiff alleged that on a telephone call the defendant used "a sarcastic tone" when asking if "she was ready to give him her social security number."  *Id*. at *2.  The defendant then asked "in a hostile tone whether she was going to 'rip them off'" and became "argumentative" on the phone call.  *Id*.  The court dismissed the case at the pleadings stage because "Section 1692d is meant to provide a remedy for harassment, oppression, and abuse, not for bad manners." *Id*. at 4. (citations omitted).  Thus, the district court determined that at the pleading level, conduct such as argumentative, hostile, or sarcastic tones, could not even state a claim for relief.  *See id.*

When considered alongside Ms. Pagel's deposition testimony, Mr. Weber's claims are nearly identical to those in *Gnoinska*.  Ms. Pagel's testimony highlights that Mr. Weber's only real grievance with Great Lakes' calls to Ms. Pagel (other than a desire not to face his student loans at all) is the Great Lakes callers' alleged tone when talking with Ms. Pagel.  But Ms. Pagel's description of the calls did not contain anything even approximating the level of "bad manners" or insulting behavior alleged in *Gnoinska*. Further, unlike the calls in *Gnoinska*, the plaintiff here—Mr. Weber—did not receive the calls at issue.

Other district courts sitting in the Seventh Circuit have held that "[w]hether repeated phone calls were made with intent to annoy, abuse, or harass depends on the volume and pattern of calls."  *Kube v. Creditors Collection Bureau, Inc.,* No. 10 c 7416, 2012 U.S. Dist. LEXIS 130350, at *4 (N.D. Ill. Aug. 30, 2012) (citation omitted).  The *Kube* court

noted there are two types of evidence that can show an intent to harass under § 1692d(5): (1)  if the plaintiff requested that the defendant stop calling; and (2) the number and pattern of the calls.  *Id*.   Mr. Weber was not living with Ms. Pagel at the time she received the phone calls, and there is only evidence that Ms. Pagel spoke to Mr. Weber after one of the phone calls.  (PFOF ¶ 81.)  No reasonable juror could find that Mr. Weber was harassed by the limited number of phone calls Great Lakes made to a reference number he provided in the MPN.  There is also no dispute that there were only three calls made over an approximately six-month period, which is an insufficient amount to constitute actionable conduct.  *See e.g. Associates Financial Services Co.*, 114 Wis. 2d at 169.  (Noting that four to five calls a month was insufficient).

Other cases dismissing claims under the FDCPA further confirm that Mr. Weber has failed to establish that Great Lakes was harassing or threatening at all, let alone prohibitively so.  *See, e.g., Allen v. Bank of America, N.A.*, No. 11 c 9259, 2012 U.S. Dist. LEXIS 158632, at * 21-22 (N.D. Ill. November 6, 2012) (defendant's demands that plaintiff "pay up" and "move out of your property right away" not actionable under the FDCPA);  *Shuler v. Ingram & Assocs.*, 441 F. Appx. 712, 718 (11th Cir. Sep. 29, 2011 ) (no violation of the FDCPA where plaintiff received 5 telephone calls, one call lasting less than five minutes because such conduct could not be found to "annoy, abuse, or harass");  *Reeves v. Messerli & Kramer, P.A.*, No. 11cv729, 2012 U.S. Dist. LEXIS 36128, at *10 (D. Minn. Mar. 16, 2012) (finding no violation of § 1692d when defendant "did not threaten violence, use profanity, or demean plaintiff, nor did it publish plaintiff's name or advertise to sell his debt");  *see also Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 809

(N.D. Ill. 2010) (holding that calling debtor a liar did not violate § 1692d); *Guajardo v. GC Servs.*, No. H-08-119, 2009 U.S. Dist. LEXIS 102084 (S.D. Tex. Nov. 3, 2009) (calling debtor a liar and saying "I can tell the kind of life you live by the fact that you don't pay your bills on time" does not constitute a violation of § 1692d); *see also Gallagher v. Gurstel, Staloch & Chargo, P.A.*, 645 F. Supp. 2d 795, 799 (D. Minn. 2009) (no violation of the FDCPA where there were "no profanities, no name calling, no insults, no unwanted calls, no disclosure of private information to third parties, nothing -- that could reasonably be deemed harassing, oppressive, or abusive.").

### C.    Plaintiff Has No Right To Punitive Damages As A Matter of Law.

Mr. Weber's Amended Complaint also seeks punitive damages pursuant to Wis. Stat. § 895.043. Consistent with this Court's July 30, 2013 Order, Great Lakes understands that punitive damages are a remedy, not a legal claim.  But Great Lakes nonetheless deems it is appropriate to ask this Court to strike any punitive damages now because even if Mr. Weber had adduced sufficient facts to survive summary judgment on his underlining claims (which he has not), Mr. Weber has clearly failed to set forth any facts from which a reasonable juror could award him punitive damages. Given Mr. Weber's clear inability to set forth a factual basis for punitive damages, striking Mr. Weber's punitive damage request now would increase judicial efficiency and help narrow the issues.

Under § 895.043, a plaintiff may only receive damages "if evidence is submitted showing that the defendant acted maliciously *toward the plaintiff* or in an intentional disregard *of the rights of the plaintiff*."  Wis. Stat. § 895.043(3) (emphasis added).  Courts

"serve as gatekeepers before sending a question on punitive damages to the jury," and "should not submit the issue of punitive damages to the jury in the absence of evidence warranting a conclusion to a reasonable certainty that the party against whom punitive damages may be awarded acted with the requisite . . . conduct." *Strenke v. Hogner*, 2005 WI 25, ¶ 40, 279 Wis. 2d 52, 71, 694 N.W.2d 296 (citations omitted).

The legislature intended the requisite conduct for punitive damages to be very high standard. *Id*. ¶¶ 19, 22. Under Section 895.043 a court should consider such things as 1) the grievousness of the wrongdoer's acts; 2) the degree of malicious intent; 3) the potential damage that might have been caused by the acts; and 4) the defendant's ability to pay. *Gianoli v. Pfleiderer*, 209 Wis. 2d 509, 527, 563 N.W.2d 562 (Ct. App. 1997). As set forth above, Great Lakes has not engaged in any wrongdoing, let alone a grievous wrongdoing as required by the statute.

This is simply not a case that could warrant any damages, let alone punitive damages. Mr. Weber was not a party to any of the calls on which he bases his WCA claims. All three calls were to Ms. Pagel, whom he listed as a reference on his MPN. Undisputed testimony demonstrates that, at best, Great Lakes asked Ms. Pagel for Mr. Weber's contact information, again, consistent with its federal loan servicing obligations. (*See* PFOF ¶¶ 53, 65, 73.) Mr. Pagel may take exception to Great Lakes "tone," but this falls far short of warranting punitive damages to Mr. Weber.

In fact, Great Lakes propounded discovery requests to Mr. Weber asking that he produce all documents or information "relating to any alleged damages." (PFOF ¶¶ 82-83, 88.) Mr. Weber failed to produce, even after a follow-up deficiency letter, any

evidence of damages.  (PFOF ¶ 88.)  It is wholly disingenuous for Mr. Weber to now suggest that he has been harmed at all, let alone in a way that warrants punitive damages.

## V.   <u>CONCLUSION</u>

For the reasons set forth above, Great Lakes is entitled to summary judgment as to all of Mr. Weber's remaining claims.  As a matter of law, Mr. Weber has not and cannot establish a violation of the FDCPA and, accepting Mr. Weber's allegations as true for purposes of summary judgment, cannot establish a violation under the WCA.  Mr. Weber is similarly not entitled to punitive damages as a matter of law.  For the foregoing reasons, Great Lakes respectfully requests that this Court enter summary judgment in its favor on all remaining counts of the Amended Complaint.

Dated this 6th day of January, 2014.

**MICHAEL BEST & FRIEDRICH LLP**

By:   /s/ Melissa H. Burkland
    Michelle L. Dama, SBN 1041809
    Nathan L. Moenck, SBN 1066208
    Melissa H. Burkland, SBN 1071443
    One South Pinckney Street, Suite 700
    P.O. Box 1806
    Madison, WI  53701-1806
    Phone:  (608) 257-3501
    Fax:  (608) 283-2275
    Email:  mldama@michaelbest.com
         nlmoenck@michaelbest.com
         mhburkland@michaelbest.com

Attorneys for Defendant
Great Lakes Educational Loan Services, Inc.