IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DUSTIN WEBER,

Plaintiff,                                           OPINION & ORDER

v.
                                                      13-cv-291-wmc

GREAT LAKES EDUCATIONAL LOAN
SERVICES, INC.,

Defendant.

---

In this civil action, plaintiff Dustin Weber alleges that defendant Great Lakes Educational Loan Services, Inc. ("Great Lakes") made three calls to his mother in connection with his student loans, in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Wisconsin Consumer Act ("WCA"), Wis. Stat. § 421 *et seq.* Currently before the court is Great Lakes's motion for summary judgment (dkt. #22), which argues that: (1) it is not a "debt collector" under the FDCPA; (2) it made no communications "in connection with the collection of any debt," as required by the FDCPA; and (3) its three calls to Weber's mother could not "reasonably be expected to threaten or harass" Weber himself, as required by Wis. Stat. § 427.104(g). Because Great Lakes is not a "debt collector" as defined by the FDCPA, the court will grant Great Lakes' motion for summary judgment on the FDCPA claim and decline to exercise supplemental jurisdiction over Weber's remaining WCA claim.

UNDISPUTED FACTS[1]

## I.  Background

Plaintiff Dustin Weber is an adult resident and citizen of Wisconsin. Defendant Great Lakes is a Wisconsin nonprofit corporation, with its principal place of business

---

[1] Unless otherwise noted, the court finds the following facts are material and undisputed.

located at 2401 International Lane, Madison, Wisconsin.  Great Lakes is one of the largest student loan providers and servicers in the United States; it services student loans for the Department of Education's Direct Loan Program.

When borrowers acquire direct student loans through the Direct Loan Program, they sign a Master Promissory Note ("MPN").  The MPN requires borrowers to provide the names, phone numbers and addresses of two references, among other things.  The MPN states that "[t]he first reference should be a parent or legal guardian."  (Shah Decl. Ex. 4 (dkt. #30-4) Section A.7.)  It also indicates that information the borrower provides may be used to service the loan.  Finally, it states that the borrower acknowledges in signing that one of the principal purposes of collecting the information on the form is "to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) become delinquent or in default."  (*Id.* at Section G.) Thus, borrowers acknowledge in signing that the information on the MPN, including the references, may be used to locate them.

As a loan servicer, Great Lakes is required to make "due diligence" efforts to contact borrowers who neither pay their loans nor try to set up alternative payment arrangements. Those due diligence obligations are set forth in Great Lakes' contract with the Department of Education and in the Higher Education Act statute and regulations.  Specifically, Great Lakes has requirements as to how many times it must contact the borrower or attempt to acquire borrower contact information from references; it also has the authority to help borrowers who have not paid their loans set up alternative payment arrangements or to postpone payment for a period of time so as to help borrowers avoid default.

2

## II. Weber's Student Loan

Weber completed the MPN in August of 2010.  He began attending the University of Wisconsin at Milwaukee in September of 2010.  The parties dispute whether Weber received the loan at issue in September of 2010 or on December 28, 2010.[2]  Regardless, Great Lakes avers through the testimony of its Chief Borrower Services Officer, Marc J. Storch, that it began servicing the loan on December 29, 2010.

Weber attended one semester of school at UW-Milwaukee.  In October of 2011, Great Lakes received notice that Weber had withdrawn from school following that one semester.  Consistent with contractual, statutory and regulatory obligations to the U.S. Department of Education, Great Lakes (1) updated Weber's status, (2) converted the loans to repayment and (3) sent Weber a payment schedule and disclosure statement with a coupon book.  Weber never made any payments on his student loans.

## III. Great Lakes' Contact Attempts

From December 2011 through March 2012, Great Lakes repeatedly tried to reach Weber by phone and mail.  Despite Great Lakes' efforts, Weber never responded.

In April of 2012, Great Lakes placed Weber's account in a "skip status," intended for borrowers whose contact information needs to be corrected.  As part of its skip status efforts, Great Lakes also e-mailed him every forty days, requesting that he provide his current contact information.   On April 16, 2012, Great Lakes sent a request to Experian/Metro, apparently a tool through which government agencies can locate

---

[2] Although Weber began attending school in September, the Associate Director of the Department of Financial Aid, Student Employment and Military Education Benefits at UW-Milwaukee avers that his loan was not disbursed until December because Weber did not complete the required entrance counseling until then.   (See Minzlaff Decl. (dkt. #32).  ¶¶ 4-5.)   While Weber attempts to characterize this dispute as another potential FDCPA violation by alleging that perhaps Great Lakes was attempting to collect on a "second loan" he never received, rather than the September loans he admits receiving, his position is unsupported by any evidence.

individuals, requesting updated contact information, but Metro was unable to provide any. On May 16, 2012, Great Lakes called Weber's father, Shawn Weber, who was one of the references Weber had listed on his MPN, but Shawn Weber's phone was identified as temporarily disconnected.  Apparently that same day, Great Lakes also called and spoke to Joy Pagel, Weber's mother and his other MPN reference.  Weber does not, and did not, live with Ms. Pagel.  While Ms. Pagel refused to provide Weber's phone number or give him a message from Great Lakes, she did provide a new address for Weber.  Great Lakes mailed a letter to Weber at this new address, but it was apparently returned with a forwarding address that matched the address Great Lakes previously had on file.[3]

On August 20, 2012, Great Lakes again called Ms. Pagel, requesting updated contact information.  Ms. Pagel again refused to provide Weber's phone number.  Two days later, on August 22, 2012, Great Lakes received a letter from Attorney Briane Pagel, indicating that he represented Weber.  The same day, Great Lakes called Attorney Pagel and left a message for him.  Two days later, on August 24, 2012, Great Lakes spoke to Attorney Pagel and advised him they could provide him no information without a Federal Privacy Act ("FPA") waiver signed by Weber.  An FPA form was then mailed to Weber and to Attorney Pagel.  On September 10, 2012, Great Lakes received a signed FPA waiver.

In October of 2012, Great Lakes called Joy Pagel again in an effort to get Weber's phone number.  Ms. Pagel again refused to provide Great Lakes with the phone number or to give Weber a message from Great Lakes.  Weber continued to make no payments on his loan.  According to Great Lakes, Weber formally defaulted on his loan on November 13,

---

[3] Weber purports to dispute this fact, arguing that no record of the letter has been provided, but as noted above, Great Lakes has offered sworn testimony from Marc J. Storch, its Chief Borrower Services Officer, to support the finding.  Weber has offered no evidence to the contrary.

2012. Weber disputes the date of default, arguing instead that he was in default as of December 28, 2010, when he was no longer enrolled in school half-time or more.

## IV. Pagel's Testimony Regarding the Calls

During the course of these proceedings, Great Lakes took the deposition of Joy Pagel. Her testimony basically tracked her affidavit (dkt. #30-1), as well as Great Lake's account of the three phone calls, except as noted below.

### A. The May 2012 Call

During her deposition, Joy Pagel could not remember the date of the first call from someone at Great Lakes, but estimated that it occurred in May of 2012; her affidavit states it occurred in June of 2012. Great Lakes' call logs confirm a call to her phone on May 15, 2012, at 12:00 P.M.[4] With regard to that call, Ms. Pagel reported being called during regular business hours on the cell phone number listed in Weber's application. She recalled being asked to provide Weber's contact information, including his address and phone number, but providing only his address. Afterward, she recalled the caller saying, "Now I would like his phone number." When Ms. Pagel declined to provide the number, the caller said, "Why won't you give me my – his phone number? I need to contact him." Ms. Pagel also testified to signing an earlier affidavit in which indicated that the caller raised his voice to "not quite a shouting level," and that she believed the caller was "hostile," "snide" and "sarcastic." She also testified that the first call lasted about five to ten minutes; Great

---

[4] Weber purports to dispute many of the facts connected with these calls. Generally, Weber simply rephrases the proposed finding of fact, adding additional detail without actually disputing the basic proposed fact. For instance, Weber claims to dispute that Great Lakes called Pagel in May, but proposes instead the fact that Great Lakes called Pagel *on her cell phone*. (*See* Pl.'s Resp. to DPFOF (dkt. #27) ¶ 34.) These are not genuine disputes of fact (nor is it obvious what would make such disputes material). In any event, where Weber declares such "disputes" without putting the underlying factual assertion at issue, those facts are deemed admitted.

Lakes' call logs show that the May 15 call lasted approximately two minutes and four seconds.

## B. The August 2012 Call

Ms. Pagel testified about another call received in late summer or early fall during regular business hours.  She estimated that the call occurred in August of 2012; Great Lakes' records show a call was made to her phone on August 20, 2012 at 10:28 A.M.  Ms. Pagel said the woman was calling for Great Lakes to obtain Weber's phone number, saying, "I want his phone number.  We don't have his phone number.  I'm calling to get his phone number."  Ms. Pagel again declined to provide Weber's phone number.  Instead, Ms. Pagel suggested writing to Weber, at which point the caller asked whether Ms. Pagel would have Weber call if she provided Great Lakes' number.  Ms. Pagel replied she did not feel comfortable doing that, and the caller allegedly ended the call at that time.  Ms. Pagel testified that this second call lasted about three to five minutes; Great Lakes' call logs show that the call lasted about one minute and 44 seconds.

## C. The October 2012 Call

Finally, Ms. Pagel testified that Great Lakes called her a third time around October of 2012.  Great Lakes' call logs show that a call was made to her phone on October 2, 2012, at approximately 5:19 P.M.  The caller introduced herself and said she was trying to obtain Weber's phone number.  Ms. Pagel informed the caller she had previously provided Great Lakes with Weber's address, but did not want to provide his phone number.  The caller then asked, "If I give you our number, will you have him call?"  Ms. Pagel responded that she would not, and the caller ended the call.  Ms. Pagel testified that this call lasted

6

approximately one to two minutes; Great Lakes' call logs show that the call lasted about one minute and 24 seconds.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

Here, Weber has failed to come forward with evidence that would support a finding that Great Lakes is a "debt collector" within the meaning of FDCPA.  Accordingly, Great Lakes, as the moving party, is "entitled to a judgment as a matter of law" on Weber's only federal claim.  *Id.* at 323.

7

**I.  Great Lakes as a "Debt Collector"**

To maintain a claim under the FDCPA, Weber must first demonstrate that Great Lakes is a "debt collector" and thus subject to the terms of the FDCPA.  *See Neff v. Capital Acquisitions & Mgmt. Co.*, 352 F.3d 1118, 1121 (7th Cir. 2003) (noting that the FDCPA "applies only to debt collectors"); 15 U.S.C. § 1692c (stating that a "debt collector" may not communicate with a consumer under delineated circumstances).  The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  The statute then lists a number of specific exclusions from the general definition, one of which states that the term 'debt collector' excludes "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person."  *Id.* at § 1692a(6)(F)(iii).  Since Great Lakes obtained Weber's student loans in December of 2010 and began servicing them the same month, long before his default in November 2012, it is this exclusion upon which Great Lakes relies.

Great Lakes cites various cases applying this exception under circumstances similar to those here.  In *Carter v. AMC, LLC*, 645 F.3d 840 (7th Cir. 2011), the Seventh Circuit considered whether a creditor's agent could "obtain" a debt without owning it.  The court found that, "although one usually 'obtains a debt by purchasing it, this is not the only way to do so.  A servicing agent 'obtains' a debt in the sense that it acquires the authority to collect the money on behalf of another."  *Id.* at 844.  The court went on to hold that the agent in *Carter* had "obtained" the debt upon the signing of the lease, long before default,

8

and that the FDCPA, therefore, did not apply to the agent's activities.  *Id.*; *accord Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 387 (7th Cir. 1998) ("Common sense and the plain meaning of [the FDCPA] require that we distinguish between an individual who comes collecting on a defaulted debt and one who seeks collection on a debt owed under a brand new payment plan, or forbearance agreement that is current."); *Johnson v. Sallie Mae Servicing Corp.*, 102 F. App'x 484, 487 (7th Cir. 2004) ("The FDCPA exempts attempts to collect debts that were not in default when obtained.").  Thus, to determine whether Great Lakes is a debt collector, the court must determine: (1) the date it "obtained" Weber's loan; and (2) the date Weber defaulted.  Neither is in dispute here.

With respect to the date Great Lakes obtained the loan, Great Lakes' Chief Borrower Services Officer Storch avers that Great Lakes began servicing the loan on December 29, 2010.  (Am. Storch Decl. (dkt. #33) ¶ 19.)  Weber has produced *no* evidence putting this fact into dispute.  (*See* Pl.'s Resp. to DPFOF (dkt. #27) ¶ 21.)  Rather, he argues only that (1) Great Lakes does not provide sufficient documentation to show that it obtained the loan in December of 2010; and (2) a reasonable jury could find Great Lakes did not acquire the loan until December of 2011, when it first began trying to contact him.  The court disagrees as to both arguments.  As for the latter argument, the court notes that no reasonable jury could find Great Lakes obtained the loan in *December* of 2011, since there is no dispute that Great Lakes converted the loan to repayment and sent Weber a payment schedule in *October* of 2011.  (*See* Reply to DPFOF (dkt. #37) ¶¶ 23-24.)  These facts simply do not allow for an inference that Great Lakes had not yet "acquire[d] the authority to collect the money on behalf of" the Department of Education.  *Carter,* 645 F.3d at 844.  Moreover, since Weber is invoking the FDCPA, he has the burden to come forward with proof that the later date applies and has not done so.

9

Even if the court credits Weber's unsupported arguments and allows for the possibility that Great Lakes did not "obtain" the debt until December of 2011, the dispute is only material if the date of default occurred after December 29, 2010, but before December of 2011. Here, Great Lakes contends that Weber was declared in default on November 13, 2012, citing again to Storch's sworn affidavit in support. (*See* Pl.'s Resp. to DPFOF (dkt. #27) ¶ 46.) Weber purports to dispute this fact. First, he argues that because his last day of school was December 23, 2010, and the loan was disbursed on December 28, 2010 (at least according to Great Lakes), he would have been *immediately* in default. As support, he points to Section C, Paragraph 12.B of his Master Purchase Note, which states, "I will use the proceeds of loans made under this MPN for authorized educational expenses that I incur and I will immediately repay any loan proceeds that cannot be attributed to educational expenses for attendance on at least a half-time basis at the school that certified my loan eligibility." (*See* Shah Decl. Ex. 4 (dkt. #30-4) Section C ¶ 12.B.) But as Great Lakes points out (and Weber himself recognizes in his brief), making the entire unpaid balance of a loan due and owing is "at [the Department of Education's] option." (*Id*. at Section E.) And there is no evidence in the record suggesting that Great Lakes actually *exercised* this option and accelerated the loans.

Weber also concedes that Great Lakes did not receive notice that Weber was no longer in school until October of 2011, which is when Great Lakes converted the loans to repayment status. (*See* Reply to DPFOF (dkt. #37) ¶¶ 23-24.) Moreoever, Weber agrees that he only received a payment schedule in October, not a demand for the entire unpaid balance due to a default. (*See id.*) Given this evidence, no reasonable jury could find that Great Lakes had exercised its option to make the entire loan balance due as of December 29, 2010.

10

Alternatively, Weber baldly asserts that "default began on the loan the first day that the loan was in repayment" (that is, sometime in October of 2011). This, too, is contrary to the explicit terms of the MPN: as is true here, unless the option to accelerate payments has not been exercised, default only occurs if the borrower does not "make installment payments when due, *provided [the] failure has persisted for at least 270 days.*" (*See* Shah Decl. Ex. 4 (dkt. #30-4) Section E (emphasis added).)[5] Under this provision, Weber would not have been in default until July of 2012, 270 days after he first failed to make the required installment payments in October of 2011. Thus, even crediting Weber's unsupported argument that Great Lakes only acquired his loan in December of 2011, Great Lakes acquired Weber's loan before default by the MPN's terms and is excluded from the definition of "debt collector" by 15 U.S.C. § 1692a(6)(F)(iii).

None of the cases Weber cites does anything to rescue his argument. He points first to *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 359 (6th Cir. 2012), for the proposition that a loan servicer cannot escape liability under the FDCPA by defining itself as neither a creditor nor a debt collector. *Id.* In *Bridge,* the Sixth Circuit stated that based on the plain language of § 1692a(6)(F)(iii), a loan servicer "can either stand in the shoes of a creditor or become a debt collector, depending on whether the debt was assigned for servicing before the default or alleged default occurred." *Id.* What a servicer *cannot* do is define itself as *neither* a creditor nor a debt collector. *Id.* Applying the reasoning of *Bridge* actually *undermines* Weber's case, rather than helps it. Based on the *Bridge* court's analysis, Great Lakes, a loan servicer that indisputably acquired the debt before default, "[stood] in the

---

[5] The MPN also states default occurs when the borrower "do[es] not comply with other terms of the loan, and ED reasonably concludes that [he] no longer intend[s] to honor [his] repayment obligations." (Shah Decl. Ex. 4 (dkt. #30-4) Section E.) Neither party argues that Weber defaulted under this provision.

shoes of a creditor," rather than playing the role of a debt collector and is not subject to the FDCPA. *Accord, e.g., F.T.C. v. Check Investors, Inc.*, 502 F.3d 159, 173 (3d Cir. 2007) ("§ 1692a means that an entity is a creditor if the debt it is attempting to collect was not in default when it was acquired."); *Whitaker v. Ameritech Corp.*, 129 F.3d 952, 958-59 (7th Cir. 1997) ("The [FDCPA] specifically does not apply to entities who acquire a debt 'not in default at the time it was obtained.'").

Weber also cites *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 538 (7th Cir. 2003), for the proposition that 15 U.S.C. § 1692a(6)(F)(iii) is subject to "multiple interpretations." In *Schlosser*, Fairbanks purchased the Schlossers' mortgage and began sending demand letters notifying them that they were in default. Fairbanks was mistaken, however: the mortgage was not actually in default when Fairbanks acquired it. *Id.* at 538. On this basis, Fairbanks argued that it was excluded from the definition of "debt collector" by § 1692a(6)(F)(iii). The Seventh Circuit disagreed, explaining that the appropriate focus when determining whether an entity fits within the § 1692a(6)(F)(iii) exclusion is the status of the obligation asserted by the assignee, rather than the true status of the debt. *Id.* at 538. Thus, Fairbanks was a debt collector, § 1692a(6)(F)(iii) notwithstanding, because it "attempted to collect on a debt that it asserted to be in default and because that asserted default existed when Fairbanks acquired the debt." *Id.* at 539.

This case is not factually comparable to *Schlosser*. Here, the court has already concluded that there is no evidence to suggest Great Lakes treated Weber's loans as being in default when it obtained them. Unlike the assignee in *Schlosser*, who purchased the mortgage on the assumption it was in default and immediately began sending demand letters notifying the Schlossers of the ostensible default, Great Lakes originally characterized Weber's loan as now due and owing pursuant to the terms of the MPS, *not* in default when

12

it was first obtained.  Nor did Great Lakes engage in any debt collection activities at that time.  Rather, Great Lakes sent Weber a coupon book and repayment schedule in October of 2011 and, when Weber never responded to this communication or made any payments, it began trying to acquire his contact information.  Thus, *Schlosser* does not help Weber's case.

Finally, Weber cites *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113 (11th Cir. 2004), for the proposition that, according to the Secretary of Education, third-party debt collectors acting to collect federal student loans must comply with the FDCPA.  This is true, but irrelevant.  As discussed, Great Lakes obtained Weber's loan before it was in default, excluding it from the definition of "debt collectors."  The Secretary's comment, therefore, makes no difference to this court's analysis.

The court concludes that on the basis of the undisputed facts, Great Lakes is not a "debt collector" for FDCPA purposes.  Great Lakes is, therefore, entitled to summary judgment on Weber's FDCPA claim.[6]

## II.  Wisconsin Consumer Act Claim

Having granted Great Lakes summary judgment on Weber's only federal law claim, the court has now "dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Accordingly, it declines to exercise supplemental jurisdiction over Weber's remaining WCA claim under Wis. Stat. § 427.104(g) and will dismiss it without prejudice.[7]

---

[6] In light of this ruling, the court need not consider Great Lakes' alternative argument that the phone calls were not made "in connection with a debt."

[7] Great Lakes also moved to strike Weber's affidavit, which he filed in order to avoid summary judgment on his WCA claim.  (Dkt. #34.)  Because the court has dismissed that claim irrespective of Weber's affidavit, that motion will be denied as moot.

ORDER

IT IS ORDERED that:

1.  Defendant Great Lakes' motion for summary judgment (dkt. #22) is GRANTED
    IN PART and DENIED IN PART.  Plaintiff's FDCPA claim is dismissed with
    prejudice; plaintiff's WCA claim is dismissed without prejudice for lack of subject
    matter jurisdiction.

2.  Great Lakes' motion to strike (dkt. #34) is DENIED as moot.

3.  The clerk of court is directed to enter judgment and close this case.

Entered this 29th day of April, 2014.

                    BY THE COURT:

                    /s/
                    _____
                    WILLIAM M. CONLEY
                    District Judge